# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

### NO. 5:08-CV-403-FL

| | | |
|---|---|---|
| SMD SOFTWARE, INC., a North Carolina<br>corporation; and SITELINK SOFTWARE,<br>LLC, a North Carolina limited liability<br>company, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| EMOVE, INC., a Nevada corporation; U-<br>HAUL INTERNATIONAL, INC., a Nevada<br>corporation; WEB TEAM ASSOCIATES, a<br>Nevada corporation; and A&M<br>ASSOCIATES, an Arizona corporation, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This case comes before the court on several evidentiary motions filed by the parties to this dispute. Plaintiffs SMD Software, Inc. ("SMD"), and SiteLink Software, LLC ("SiteLink") have filed motions to exclude the testimony and reports of defendants' proffered experts Tom Litton ("Litton") and Dr. Carson Bays ("Bays") (DE 179, 183). Likewise defendants EMove, Inc. ("EMove"), U-Haul International, Inc. ("U-Haul"), Web Team Associates ("Web Team") and A&M Associates ("A&M") have filed motions to exclude the testimony and reports of plaintiffs' proffered experts, Dr. Nicholas Didow ("Didow") and Dr. William Putsis ("Putsis") (DE 190, 192). Also before the court is plaintiffs' motion to exclude opinions of Litton and Bays not disclosed in their reports (DE 238). All of the motions have been fully briefed and are ripe for ruling. For the reasons that follow, the court GRANTS defendants' motion to exclude Putsis, GRANTS in part and DENIES

in part defendants' motion to exclude Didow, GRANTS in part and DENIES in part plaintiffs' motions to exclude Litton and Bays, and GRANTS in part and DENIES in part plaintiffs' motion to exclude the opinions of Litton and Bays not included in their report.

## STATEMENT OF THE CASE

On July 14, 2008, plaintiffs initiated this action in Wake County Superior Court. On August 20, 2008, the action was removed to this court by U-Haul, at that time the only defendant. Plaintiffs, who sell self-storage management software products called "SiteLink," ("SiteLink PC") and "SiteLink Web Edition," asserted state law claims for defamation, unfair or deceptive trade practices, and tortious product disparagement arising out of alleged misrepresentations about plaintiffs' software on comparison charts used in advertising brochures for a competing software program, "WebSelfStorage." Three versions of the charts were published, the first in 2004, the second in 2005, and the last in 2008. All of the software programs are intended for use by the operators of self-storage facilities.

On October 7, 2008, plaintiffs filed an amended complaint. The amended complaint named EMove, a wholly-owned subsidiary of U-Haul which sells WebSelfStorage, as the sole defendant. Plaintiffs asserted violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in addition to the state law causes of action contained in their initial complaint. Two days later, plaintiffs filed a voluntary dismissal without prejudice as to U-Haul.

Subsequently, plaintiffs filed a second amended complaint, reasserting their claims against U-Haul, including now the Lanham Act claim, and also asserting those claims against Web Team and A&M, two U-Haul subsidiaries. According to plaintiffs, U-Haul owns WebSelfStorage, Web Team designed the software and provides technical support to users, and A&M produced the

2

advertising materials at issue. All three defendants are alleged to have collaborated with their sister company EMove in the alleged defamatory advertisement.

On April 18, 2011, each party filed two motions under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), seeking to exclude the reports and testimony of the other sides' proffered expert witnesses. In response to defendants' Daubert motions, plaintiffs' experts both filed affidavits further discussing their qualifications and opinions. Plaintiffs filed a motion to exclude what they argued were new opinions not timely disclosed contained in those affidavits.

## COURT'S DISCUSSION

A. Standard of Review

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of proof. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). A district court is granted broad latitude in making its determination on the admissibility of proposed expert testimony. United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994) ("The trial judge has broad discretion under Rule 702."). Review of the Daubert case law by the advisory committee shows that the rejection of expert testimony is the exception rather than the rule. Fed. R. Evid.702 advisory committee's note (2000).

Rule 702 provides that expert testimony is appropriate when it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 further provides that a witness qualified as an expert may be permitted to testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

3

Id. Courts have distilled the requirements of Rule 702 into two crucial inquiries: whether the proposed expert's testimony is relevant and whether it is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993); United States v. Forrest, 429 F.3d 73, 80 (4th Cir. 2005). The trial court must carry out the special gate-keeping obligation of ensuring that expert testimony meets both requirements. Kumho Tire, 526 U.S. at 147; United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006), overruling on other grounds recognized by United States v. Diosdado-Star, 630 F.3d 359 (4th Cir. 2011).

In order to be considered relevant, the proposed expert testimony must appear to be helpful to the trier of fact. See Daubert, 509 U.S. at 591-92. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

"'[T]he test of reliability is flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" United States v. Wilson, 484 F. 3d 267, 274 (4th Cir. 2007) (quoting Kumho Tire, 526 U.S. at 141-42). One factor pertinent to reliability is the proposed expert's qualifications. See Giddings v. Bristol-Myers Squibb Co., 192 F.Supp.2d 421, 425 (D. Md. 2002). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. Kumho Tire, 526 U.S. at 147. The Fourth Circuit has ruled that when an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" Kopf, 993 F.2d at 377 (quoting Thomas J Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)).

4

Additional factors also bear on the reliability of the expert's testimony. They may include: "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community." Tunnell v. Ford Motor Co., 245 Fed. App'x. 283, 286 (4th Cir. 2007) (citing Kumho Tire, 526 U.S. at 149-50); accord Daubert, 509 U.S. at 593-94. In addition, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994).

Of course, the admission of expert testimony must be considered within the context of the other rules of evidence. In particular, Rule 403 provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. As this court has noted, "[d]espite the court's ability to exercise broad discretion and flexibility when determining the admissibility of expert testimony, the court must balance this discretion with the concerns of Rule 403 to ensure that the probative value of the proffered testimony is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, 725 (E.D.N.C. 2007) (quoting Fed. R. Evid. 403).

5

B.    Analysis

      1.    Motion to Exclude Dr. Putsis

Dr. Putsis is a Professor of Marketing at the University of North Carolina Kenan-Flagler Business School. Plaintiffs engaged him to evaluate the impact of the allegedly false claims made by the comparison charts on plaintiffs' business. Putsis conducted a survey purporting to determine the impact of the comparison charts. Based upon the results of that survey, he concluded that the representations in the 2008 comparison chart caused plaintiffs to lose a specific percentage of market share.

Defendants argue that Putsis's opinions are based on flawed or speculative assumptions, not supported by evidence in the record. One of the assumptions defendants note is that every customer in the market who read the charts would have made a purchasing decision based on them.[1] That Putsis makes this assumption is clear. Putsis's survey purported to determine how many potential customers who otherwise would have purchased plaintiffs' software did not because of the 2008 comparison chart. The survey presented respondents with a neutral comparison table detailing the pricing and features of fifteen (15) hypothetical unnamed self-storage management software programs. No names were used, but some of the anonymous programs on the table reflected the description of plaintiffs' programs –SiteLink PC and SiteLink Web Edition – given in the 2008 comparison chart. Other programs reflected what plaintiffs believed were accurate descriptions of

---

[1] Defendants also argue that Putsis made two additional assumptions they assert are groundless, namely that (1) 100% of the market made a purchasing decision in 2008, and (2) 75-95% of the market saw and was impacted by the 2008 comparison chart. Plaintiffs disagree that Putsis made the first assumption, and contends that the second is supported by evidence of record. Where the court does not need to reach these alleged assumptions in making its decision, it does not consider them here. Further, defendants also argue that the survey should be excluded where they allege the company used to conduct the survey has financial ties to plaintiffs and is inexperienced in implementing surveys like this one. Once again, the court does not reach this issue.

6

their programs' pricing and features. Based upon the preferences indicated by survey respondents, and their responses to questions asked about their buying habits and preferences, Putsis concluded that the allegedly false representations resulted in plaintiffs' losing a specific percentage of market share.

Putsis' survey – which forces respondents to choose products based solely on information contained in a table – can only be said to accurately show what percentage of those who read the 2008 comparison chart were thereby led not to purchase plaintiffs' software if those customers made a decision based solely on the comparison chart. This is a dubious proposition. In the first place survey respondents were given an apparently objective and trustworthy comparison table. In reality, the comparison charts which are subject of the claims in this case appeared near the back of defendant EMove's advertising brochures and was clearly advertising material, which is often viewed with skepticism. See Scotts Co. v. United Indus. Corp., 315 F.3d 264, 280 (4th Cir. 2002) ("The survey thus elicited information about the consumer's reaction to an isolated part of the packaging, when the relevant issue in a false advertising case is the consumer's reaction to the advertisement as a whole and in context.").

Furthermore, the survey did not allow respondents to opt out, or to say they would like more information before making a purchasing decision. Respondents had to make a decision based on the information they were given. As Didow, plaintiffs' other proffered expert, asserts, a commercial buyer will not make a quick decision for a purchase such as this, but will consider large amounts of information. See Didow dep. (February 21, 2012) 95.[2]

---

[2] Didow stated that a purchase like this is "an important decision for these entrepreneurs . . . . [I]t's the kind of buying situation for these entrepreneurs that – that suggest its – they – they will require a lot of information. They will process a lot of information. They will be – they will be very diligent within – within the competitive set of – of

7

Plaintiffs point to no evidence of record suggesting Putsis's assumption that all buyers who read the 2008 comparison chart would rely on it exclusively in making a decision is true. Putsis notes in his report that "if [the advertisements] did not work, there would be no reason for EMove to distribute such flyers and advertisements in the first place; their own actions speak to the effectiveness of such communication strategies." Putsis Report 4. There is a large unsupported leap, however, from evidence that an advertisement is effective to concluding all customers who read it exclusively relied on it in making a purchasing decision. Thus, Putsis's conclusion that plaintiffs suffered a specific percentage loss of market share is based upon speculative assumptions not supported by the record and should be excluded. See e.g., E. Auto Distributors, Inc. v. Peugeot Motors of Am., Inc., 795 F.2d 329, 337-38 (4th Cir. 1986) (excluding expert's damages calculations that were based on the assumption that vehicle shortages set back growth in the number of plaintiff's automobile dealerships by two years because no evidence supported that assumption); Perry v. Scruggs, 17 F. App'x 81, 87 (4th Cir. 2001) (expert's calculation of damages accruing to plaintiffs due to defendants' failure to build a golf course on plaintiffs' property was inadmissible where his calculations relied on speculative assumptions, namely, when the course would have been built by, that the course would have annually generated comparable business to that generated in 1999 by another course built on plaintiffs' property, and that plaintiffs could increase their prices parallel to the projected inflation rate); Blake v. Bell's Trucking, Inc., 168 F.Supp.2d 529, 533 (D.Md. 2001); PBM Products, LLC v. Mead Johnson Nutrition Co., 3:09-CV-269, 2010 WL 56072 (E.D. Va. Jan. 4, 2010) aff'd sub nom. PBM Products, LLC v. Mead Johnson & Co., 639 F.3d 111 (4th Cir. 2011).

---

service providers that – in their consideration set."

Plaintiffs respond that these critiques are irrelevant because Putsis's survey was only designed to determine whether the allegedly false statements were *material*. Materiality, or whether the statements were "likely to influence the purchasing decision," is an element of a Lanham Act violation. Scotts Co., 315 F.3d at 272 (quotations omitted). Where, as here, plaintiffs seek monetary damages, "actual damages and a causal link between defendant's violation and those damages" are also elements of a Lanham Act violation. Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Marrell Dow, Inc. 93 F.3d 511, 515 (3rd Cir. 1996).

It is simply not the case that Putsis's report is limited to materiality. Rather, Putsis purports to show causation and the quantum of damages by arguing that the comparison charts in fact caused plaintiffs to lose a specified percentage of market share. See Putsis Report, 5-7. Therefore, the court finds Putsis's opinion concerns causation and damages, and his opinion is based on speculative assumptions not supported by the record.

Moreover, insofar as the survey purported to test materiality, the same flawed assumptions undermine the survey's reliability. Survey respondents were forced to make purchasing decisions based upon a neutral-looking chart. Again, such a survey would only accurately gauge materiality of the comparison charts if customers made their purchasing decisions based upon the representations made in that advertising brochure. The purpose of Putsis's survey was to determine what impact the charts have. His unsupported assumption that charts would be what customers used to make purchasing decisions begs the fundamental question. Thus, defendants' motion to exclude his report and testimony is granted.

9

2.    Motion to Exclude Dr. Didow

Dr. Didow is an Associate Professor of Marketing at the University of North Carolina Kenan-Flagler Business School. Plaintiffs engaged him to opine as to the damages resulting from the use of the comparison charts, as well as to offer his opinion as to the veracity of the comparison charts. Using an accepted method known as the Auto Regressive Integrated Moving-Average model, Didow concluded that the comparison charts have caused and will cause plaintiffs to lose a total of nearly forty million dollars ($40,000,000.00) in profits from 2005 until 2024, and defendants to gain over two hundred and fifty million dollars ($250,000,000.00). Didow also concluded that the statements plaintiffs took issue with on the comparison charts were false, and that defendants did not comply with advertising standards in substantiating their claims.

Defendants move to exclude the report and testimony of Didow arguing that he is not qualified to opine on the veracity of the comparison charts and not qualified to offer an opinion on damages. Defendants also contend that Didow relied on flawed assumptions in calculating damages and therefore his report and testimony are not reliable. Defendants argue third that his alternative damages calculation should be excluded as irrelevant. Finally, defendants' urge portions of Didow's report are inadmissible where they comment on defendants' state of mind, subsequent remedial measures, and reference prior litigation between defendant U-Haul and Jartran, Inc., which defendants' argue is irrelevant here.

a.    Didow's Qualifications to Opine as to Veracity

With respect to the veracity of the comparison charts, plaintiffs proffer Didow's opinions that (1) defendants did not comply with advertising standards in substantiating their claims, and (2) that many of claims made on the comparison charts were false. In considering Didow's substantiation

10

opinion, the court notes that a Lanham Act plaintiff "must prove that the claim is false or misleading, not merely that it is unsubstantiated." Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 129 (3d Cir. 1994). See also PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011) ("For liability to arise under the false advertising provisions of the Lanham Act, the contested statement or representation must be either false on its face, or, although literally true, likely to mislead and confuse consumers given the merchandising context.") (quotations omitted); Procter & Gamble Co. v. Chesebrough–Pond's Inc., 747 F.2d 114, 119 (2d Cir. 1984) ("[P]laintiff bears the burden of showing that the challenged advertisement is false and misleading, not merely that it is unsubstantiated . . . .") (citations omitted); U–Haul Int'l, Inc. v. Jartran, Inc., 522 F.Supp. 1238, 1248 (D.Ariz.1981) aff'd, 681 F.2d 1159 (9th Cir. 1982); Toro Co. v. Textron, Inc., 499 F. Supp. 241, 253 (D. Del. 1980).

In this case, Didow's opinions regarding defendants' failure to meet the FTC standards for claim substantiation do not establish a violation of the Lanham Act. Failure to meet these standards may be relevant in other causes of action, however. See Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 227-28 (3d Cir. 1990) (FTC may find violations of Sections 5 and 12 of the FTC Act where defendants inadequately substantiate claims, but Lanham Act plaintiffs must show an advertisement is actually false or misleading). Therefore this testimony may create a danger of confusing the issues.

Plaintiffs, however, argue that a failure to substantiate claims may be evidence of willful and wanton conduct relevant to awards of attorney's fees or punitive damages. Willful or wanton conduct related to the injury for which damages are awarded may form the basis for punitive damages under North Carolina Law. N.C. Gen. Stat. § 1D-15. Willful or wanton conduct is defined

11

as "conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen Stat. § 1D-5(7). Where evidence may show that a conscious disregard led defendants to fail to substantiate their claims, resulting in false claims, plaintiffs may be able to demonstrate violations that were willful or wanton. Therefore, this evidence is relevant, and plaintiffs may introduce evidence related to claim substantiation. The court, however, will carefully scrutinize such testimony under Rule 403.

Turning to Didow's opinions that many of the claims made about plaintiffs' software were false, the court finds that there is not a fit between Didow's marketing expertise and the truth or falsity of claims about the capabilities of plaintiffs' software. A witness may be qualified as an expert because of "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Where, however, a purported expert witness has "neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered" that witness's testimony may be excluded. Thomas J. Kline, Inc., 878 F.2d at 799.

In this case plaintiffs proffer Didow's opinions that various statements regarding the cost and functionality of plaintiffs' software products on the 2004, 2005, and 2008 comparison charts were untrue. While he is an expert in the field of marketing, he has no special knowledge, skill, experience, training, or education relating to software or the self-storage industry. Plaintiffs admit Dr. Didow relied on plaintiffs' representations as to the price of their products in opining that the price representations on the comparison charts were false. Pls.' Resp. Opp'n. Mot. to Exclude Didow 14. The remainder of his opinions were formed by spending several hours reviewing training materials, seeing product demonstrations, and using plaintiffs' product.

12

Didow himself stated he was not an expert on plaintiffs' software, Didow dep. (February 17, 2012) 181-82, nor on the operations and workings of the self-storage industry. Id. at 56. His familiarity with the self-storage industry comes from attending one trade show after being retained, and having rented a self-storage unit. Id. at 55, 64-65. Thus he does not possess the requisite "scientific, technical, or other specialized knowledge" that would assist the trier of fact. Fed. R. Evid. 702. See also Thomas J. Kline, Inc., 878 F.2d at 799-800 (district court abused its discretion in admitting "expert" testimony on whether defendant's shift in credit practices was unjustified credit and price discrimination under the Robinson-Patman Act by a witness who's only qualifications were an MBA and who had no experience in making credit decisions).

Furthermore, even if, as plaintiffs argue, it was "plain to Dr. Didow that Defendants' representations regarding SiteLink and SiteLink Web Edition's features (or lack thereof) were false and unsupportable," id., after a few hours spent examining and using plaintiffs' products, then this is not even an area where expert testimony would be helpful to the trier of fact. Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror. Persinger v. Norfolk & Western Railway Co., 920 F.2d 1185, 1188 (4th Cir. 1990). Where plaintiff has shown in this aspect of its presentation that a person with no special expertise in software can determine that plaintiffs' software products have certain functionalities after only a brief opportunity to use them, plaintiff has undermined its contention that a jury needs expert assistance in order to understand whether the products have those functions. Therefore as Didow's opinion as to the veracity of the claims made in the comparison charts is not based relevant expertise, or alternatively, not helpful to a trier of fact, defendants' motion to exclude this testimony is granted.

13

b.    Didow's Qualifications to Opine on Damages

Defendants next assert that Didow is not qualified to offer an opinion on damages as he is neither an accountant nor an economist, has not taken training on how to calculate damages, and has never before been proffered as an expert on damages. Didow, however, does have specialized skill, experience, or training in this area. He has a Ph.D. from Northwestern University with a major in marketing and a minor in evaluation research. In his field of market research, he engages in econometric studies and has testified that he has used "identical tools" as those used to calculate damages in a business loss case in those econometric studies. Didow dep. (February 17, 2012) 46, 50-53. Moreover he has experience in analyzing profit and loss sheets and business expenses, as well as in case analysis including profit and loss assessment. Id. at 54.

When "an expert's qualifications are challenged, the test for exclusion is a strict one . . . . 'One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.'" Kopf, 993 F.2d at 377 (quoting Thomas J. Kline, Inc., 878 F.2d at 799). Although others may be even more qualified to opine on damages, it is clear that Didow has knowledge, skill, experience, training, and education in the tools used for damage calculation. Therefore, especially where a "witness' qualifications to render an expert opinion are liberally judged by Rule 702," Dr. Didow's specialized knowledge of econometrics renders him qualified to opine on damages. Id. at 377.

c.    Didow's assumptions

Defendants also argue that Didow's testimony as to damages must be excluded as unreliable where they argue it rests on unsupported assumptions. Defendants point to four assumptions they contend render his analysis unreliable: (1) that the comparison charts were the only factor that could

14

explain the parties' revenues; (2) his revenue forecast was based on SiteLink PC only and not SiteLink Web Edition; (3) his use of customers loyalty rate to SiteLink Web Edition for both plaintiffs' software products, and (4) that the comparison charts will have an impact felt for fifteen (15) years.

"An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." Tyger Const. Co. Inc., 29 F.3d at 142. Courts may also consider whether an expert has adequately accounted for obvious alternative explanations in determining whether or not that expert is reliable. Fed. R. Evid. 702 advisory committee's note (2000 amendment). See also Pharmanetics, Inc. v. Aventis Pharms., Inc., 182 F. App'x 267, 270-73 (4th Cir. 2006) (proposed expert was properly excluded where he assumed appellee's actions caused all of appellant's losses instead of causes reasonably inferred from the record).

In this case, Didow first considered several other factors which may have explained the parties' deviation from his projected revenues, including, but not limited to, changes in the parties' marketing efforts, incidences of either problems or recognition for excellence in the parties' products, macroeconomic factors, consolidation in the self-storage industry, and change in management or senior sales staff. He concluded that there was either no evidence of the occurrence of these factors, or that they did not explain the parties' revenues during the time the comparison charts were in use. Defendants may argue that yet other factors might explain the parties' relative performance. However, "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (citing Cavallo v. Star Enter., 100 F.3d 1150, 1159-59 (4th Cir. 1996)). Defendants may properly challenge this testimony by "'vigorous cross-examination, presentation of

15

contrary evidence, and careful instruction on the burden of proof.'" Id. (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993)).

Where Didow used the loyalty rate for SiteLink Web Edition, this number was used to measure the loyalty of plaintiffs' customers across the board because he felt it would be impossible to measure to accurately measure the loyalty rate for SiteLink PC users. Once SiteLink PC is sold, since customers do not purchase monthly subscriptions, it may not be possible to ascertain if they were remaining loyal to the product or using another. Didow dep. (February 21, 2012) 41-42, 83. On the other hand, customers must pay a monthly subscription fee for use of SiteLink Wed Edition. Furthermore, as defendants' own proffered expert, Tom Litton, notes "when software was sold as stand-alone PC based products . . . software users would remain loyal . . . . [S]ince vendors now charge a monthly use fee [for web-based products, customers] . . . can more readily leave a vendor and are thusly less loyal." Litton Report 3, 10. Defendants may challenge Didow's conservative assumption on cross-examination, but this is not proper grounds for excluding his report.

Similarly, defendants' other critiques of Didow's analysis do not show it to be unreliable. Didow opines that a reasonable product life cycle for the software products was fifteen (15) years based on the cycles of other management and professional software such as Microsoft Office, Quicken, and Lotus Notes. Didow also explained that he based his revenue forecast in SiteLink PC sales because SiteLink Web Edition was not released until after the comparison charts had been released, and that the availability of both products may actually have increased plaintiffs' sales and profits. Where defendants think Didow's analysis did not properly consider certain factors, this is proper fodder for cross examination. See PBM Products, LLC 2010 WL 723739 at *4 (where expert

16

explained why certain variables were used and others not, thorough cross-examination was appropriate where opposing party had critiques of the analysis and factors chosen).

> d. Alternative Damages Calculation

At the request of counsel, Didow's included an alternative damages calculation in his report wherein he multiplies the number of customers plaintiffs purportedly lost by defendants' annual revenue per customer extended out for fifteen (15) years. Didow Report 60-61. Defendants move to exclude this as irrelevant. Under the Lanham Act, a successful plaintiff is, subject to the principles of equity, entitled to recover,

> (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

15 U.S.C. § 1117(a).

Thus a successful plaintiff may recover a defendant's profits from the defendant's false advertising, any damages the plaintiff sustained, and costs of the action. Didow's alternative damages analysis – multiplying the number of customers he believes plaintiffs lost by the average annual revenue generated by defendants per customer – is not a method found in the statute. Didow admits that not all of the customers plaintiffs allegedly lost became customers of defendants. See Didow dep. (February 17, 2012) 239-40; Didow dep. (February 21, 2012) 77. Moreover, the statute refers to profits, not revenues. Since this damages calculation is something not provided for by the statute it "does not relate to any issue in the case[,] is not relevant, and, ergo, non-helpful." Daubert, 509 U.S. at 591. Therefore it is excluded.

17

e.    Other Objections to Didow's Report

Defendants object to portions of Didow's report where he references (1) a sticker added to the 2008 comparison chart clarifying the definition of the term "fully integrated", (2) his beliefs as to defendants' state of mind, and (3) his references to U-Haul International, Inc. v. Jartran, Inc., 793 F.2d 1034 (9th Cir. 1986).

"When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: . . . culpable conduct." Fed. R. Evid. 407. Didow opines that defendants' decision to put a sticker on the 2008 comparison charts defining the use of the term "fully integrated" shows they knew that the term was confusing and misleading – that defendants knew that using the chart was culpable conduct. Didow Report 21-22. Similarly, Sam Celaya, president of defendant EMove, testifying as its corporate representative testified that the sticker was placed on the 2008 charts in part to more completely explain the term in light of plaintiffs' lawsuit. Defs.' Mem. Supp. Mot. to Exclude Didow, Exhibit S, EMove 30(b)(6) Dep. 328-29.

Despite Didow's clear opinion that the sticker was a remedial measure which – he maintains – demonstrates defendants' culpability, plaintiffs argue that Didow's opinion should not be excluded, claiming the sticker was not a remedial measure but was done to further promote defendants' product. This argument is without merit. While one purpose of this sticker may have been to highlight features of defendants' product, this does not mean it was not also a remedial measure. Therefore Didow's references to the sticker are properly excluded under Rule 407.

Defendants also object to those portions of Didow's expert report wherein he opines as to what defendants' state of mind was with respect to such things as why they continued to offer

18

comparison charts, what they "learned" from the <u>Jartran</u> case, and their intent in using the clarification sticker on the 2008 comparison chart. Testimony about intent or motive lies outside the bounds of expert testimony. <u>Talley v. Novartis Pharmaceuticals Corp.</u>, No. 3:08-CV-00361, 2011 WL 7941938, *1 (W.D.N.C. Jun. 28, 2011) (citing <u>In re Rezulin Prods. Liab. Litig.</u>, 309 F.Supp.2d. 531, 541, 547, 554 (S.D.N.Y. 2004)). <u>See also</u> <u>Scurmont LLC v. Firehouse Rest. Group, Inc.</u>, No. 4:09-CV-00618, 2011 WL 2670575, *8 (D.S.C. Jul. 8, 2011) (plaintiffs conceded their experts proposed testimony as to defendants' intent was improper). Thus, his opinions as to defendants' state of mind are excluded.

Finally, defendants object to Didow's references to the <u>Jartran</u> case as irrelevant and unduly prejudicial where they maintain it has no bearing on the instant case, and that Didow's primary purpose in referencing it appears to be to discuss the award given to defendant U-Haul in that matter. Plaintiffs respond that the <u>Jartran</u> case is relevant to the issue of whether defendants acted willfully and wantonly in deviating from business practices in comparative advertising as they had knowledge of appropriate standards based upon their having been a party in <u>Jartran</u>.

Where defendant U-Haul was a party in <u>Jartran</u>, that case is relevant to whether defendants' conduct was willful or wanton, and so relates to matters such as punitive damages under N.C. Gen. Stat. § 1D-5(7). Because <u>Jartran</u> was a Lanham Act case involving comparative advertising, that case may serve as evidence that if defendants did not properly substantiate their claims, such conduct was willful or wanton where defendants knew or should have known that such a failure was reasonably likely to result in damage to plaintiffs. However, the amount of damages awarded in that case has no relevance. Thus Didow may testify regarding <u>Jartran</u>, but may not reference the amount of damages awarded. <u>Cf.</u> <u>PBM Products, LLC</u>, 639 F.3d at 124-25 (prior Lanham Act litigation

19

relevant to defendant's intent in making its advertising claims, but specific evidence of the settlements in those cases was properly excluded).

3. Motion to Exclude Mr. Litton

Mr. Litton is a self-storage management consultant with over thirty (30) years experience in the self-storage industry. He has managed over one hundred and fifty (150) facilities in eleven (11) states, and was the operations manager for National Self Storage, the seventh largest self-storage company in the United States. In addition to his work as a consultant, he currently owns or manages fifteen (15) self-storage properties. Defendants engaged him to opine as to the veracity of the representations in the comparison charts, to opine as to whether customers would have relied on those charts in making a software purchasing decision, and to offer various opinions intended to rebut Didow's damages analysis.[3]

Plaintiffs move to exclude the report and testimony of Litton arguing that he is unqualified to opine on the accuracy of the comparison charts and has no factual basis on which to do so, that no experience or methodology supports his conclusions as to the effect of the charts on consumers, and that he lacks the qualifications to rebut Dr. Didow. Defendants maintain that Litton is properly qualified to opine on all of these matters based upon his extensive experience in the self-storage industry.

A party may qualify as an expert on the basis of experience alone. Fed. R. Evid. 702. See also Kopf, 993 F.3d at 377 ("Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or

---

[3] Defendants also proffered Litton to testify as to the unreliability of Dr. Putsis's survey and testimony. Where the court is excluding Putsis's report, survey, and testimony, the question of whether Litton may offer his opinion as to the flaws with respect to Putsis is now moot.

20

education."). "Experiential expert testimony . . . does not rely on anything like a scientific method" and thus need not be scientifically testable to be admissible. Wilson, 484 F.3d at 274 (quotations omitted). However, when a party seeks to offer an expert's opinion based on the expert's experience, the expert must be able to explain "[1] how that experience leads to the conclusion reached, [2] why that experience is a sufficient basis for the opinion, and [3] how that experience is reliably applied to the facts." Fed. R. Evid.702 advisory committee's note (2000).

a.   Litton's Opinion as to Veracity

Plaintiffs argue that Litton is not qualified to offer his opinion as to the veracity of the comparison charts. However, Litton has used plaintiffs' products in two facilities he operates since 2005, and has used their software to audit approximately fifteen (15) other facilities. Further, as a consultant, he has helped many clients to configure plaintiffs' software after purchasing it, and update those configurations when necessary in response to changes in lien laws or client preferences. He even conducts private seminars advising storage owners and managers on how to configure their software to comply with legislative changes. Defs. Resp. Opp'n Ex. A. Litton Aff. ¶¶ 7-8. Thus his extensive experience with plaintiffs' software gives him ample basis upon which to opine as to the veracity of the claims in the comparison charts regarding plaintiffs' software features.

He is also qualified to opine as to the veracity of the pricing information where he has twice purchased SiteLink PC for two of his facilities, spoken with clients about prices they were charged for plaintiffs' software, and most importantly, reviewed plaintiffs' sales records to see what prices they charged for their software. Defs. Resp. Opp'n Ex. A. Litton Aff. ¶ 10. Therefore plaintiffs' motion to exclude Litton from testifying as to the veracity of the charts is denied.

21

Plaintiffs maintain that his experience does not qualify him to opine as to the veracity of the information in the comparison charts where he has no expertise in preparation or verification of comparative advertising. Plaintiffs' argument is without merit. As discussed above, the question is not whether the charts were properly created and the claims therein properly substantiated, but whether or not the claims were true.

     b.   Litton's Opinion as to the Impact of the Comparison Charts

Plaintiffs also argue that Litton is not qualified to opine as to the effect the comparison charts had on consumers, and that his conclusions are not supported by a reliable methodology. Once again, his extensive experience in consulting and helping clients decide which software to purchase qualifies him to opine as to what clients consider in making their purchasing decisions.

As a consultant he has often advised clients on how to select software and those clients typically have explained to them what motivates their decisions. Defs. Resp. Opp'n Ex. A. Litton Aff. ¶ 11. He has also conducted seminars all over the world discussing software choices where participants have explained factors upon which they base their decisions. Id. at ¶ 13. He attends numerous trade shows – about thirty-five (35) in the last ten (10) years alone – where he has discussed with consumers their software choices. Id. at ¶¶ 5, 15. He personally has purchased self-storage management software over twenty-five (25) times. Id. at ¶ 6. The length of his experience *in the industry*, and the breadth of his consulting experience have given him a wealth of experience in seeing how consumers make their purchasing decisions. It is from this experience that he has come to his conclusions about the impact of the comparison charts on consumers, and his extensive experience is a sufficient basis for his conclusion. Therefore plaintiffs' motion to exclude his testimony as to the impact of the charts is denied.

22

c.    Litton's Opinions Offered to Rebut Didow

Litton offers eight opinions with respect to Didow's damage calculations. He opines that (1) Didow's fifteen (15) year damage forecast is too long where the industry trend is towards web oriented software enabling easier switches between software; (2) EMove's growth is attributable to its low price, features, and affiliation with U-Haul; (3) the pricing structure for SiteLink Web Edition had some effect on plaintiffs' revenues; (4) plaintiffs' client base continued to grow during the time in which the comparison charts were being circulated; (5) Didow's calculation of additional costs plaintiffs would incur from gaining additional customers was too low; (6) the revenues on plaintiffs' financial statements are inconsistent with Didow's representations of plaintiffs' revenues; (7) plaintiffs' financial statements do not appear to include the expenses typically associated with a normal business; and (8) the profit margin utilized by Didow is too high.

To begin with, it is not Litton's opinion that plaintiffs' client base continued to grow during the time the comparison charts were being used. It is an uncontested fact. Indeed, Didow's own report shows that plaintiffs' client base continued to grow. Plaintiffs also note that Didow's calculation of plaintiffs' revenues only includes their revenues from software sales and not all of plaintiffs' revenue sources. Thus Litton's assertion that Didow's revenues do not match the full revenues listed on plaintiffs' financial statements is also an uncontested fact. Where Litton has knowledge of these facts from examination of plaintiffs' financial records and Didow's report, he is not barred from testifying thereto.

Litton's opinions that a fifteen (15) year damage forecast is too long and that EMove's growth is attributable to its price, features, and affiliation are supported by his extensive experience in the industry where he has had numerous conversations with other members of the industry as to

23

what software they picked and why, and also would have some sense of how often they changed software.

However, Litton's experience is in the self-storage industry, and not the software industry, of which plaintiffs are members. There is no match between his experience and his conclusions that the expenses listed in plaintiffs' financial statements are too low. His experience in the self-storage industry also does not give him a basis to opine that plaintiffs would incur expenses beyond those listed by Didow when they gained new customers and that the profit margin Didow calculated that plaintiffs would enjoy from new customers is too high. Nor does his experience qualify him to opine as to the impact of SiteLink Web Edition's pricing structure on plaintiffs' revenues. Litton's conversations – after he was retained – with owners of two of plaintiffs' competitors relating to profit margin and expenses do not give him sufficient qualifications to testify as to these issues. Litton Dep. 27-29, 55. Accordingly, these aspects of his opinion will be excluded.

4.     Motion to Exclude Dr. Bays

Dr. Bays is an Emeritus Professor of Economics at East Carolina University. He was retained by defendants to rebut the analysis of Dr. Didow.[4]  Plaintiffs move to exclude the report and testimony of Bays, arguing that his opinions on Didow's regression analysis lack a reliable basis, and his assertion that Didow should not have assumed for purposes of his analysis that the comparison charts were false and misleading is incorrect and outside of the role of an expert.

In his report and deposition, Bays raises multiple factors which he contends could also have potentially affected the parties' revenue that were not considered by Didow. Defendants argue that

[4] As with Litton, Bays was also retained to testify as to the unreliability of Putsis's survey and testimony. Again, where Putsis has been excluded, the question of whether Bays may rebut Putsis's analysis is moot.

24

where he has presented no evidence of methodology indicating that these factors did affect the parties' revenue his opinion is unreliable and must be excluded.

Plaintiffs argue that merely pointing out factors which might have affected Didow's analysis – without a showing that they would have affected it – is not grounded in any science or methodology and therefore inadmissible under Rule 702. Rule 702 provides that where expert testimony will assist the jury, it is admissible so long as it is relevant and reliable. Kumho Tire Co., 526 U.S. at 141. Here Bays's testimony is grounded in his education and thirty-seven (37) years experience in the field of economics. His extensive education and experience have provided him with knowledge as to what factors are worth considering as those which potentially may impact the parties' revenues.

Plaintiffs contend that Bays must put forward affirmative evidence that any purported missing factor would impact Didow's analysis. In support, plaintiffs cite In re Linerboard Antitrust Litig., 497 F. Supp. 2d. 666, 678 (N.D. Ill. 2007), Sobel v. Yeshiva Univ., 839 F.2d 18, 33-34 (2d Cir. 1988), and Palmer v. Schultz, 815 F.2d 84, 101 (D.C. Cir. 1987). These cases are all distinguishable. Linerboard held that unless a party challenging the *admissibility* of a regression analysis can show that "an omitted variable . . . is likely to affect the result of the regression analysis" it will not be excluded. Id. at 687. This is a separate issue from what an opposing expert must show in order to question whether variables have been omitted. Similarly Sobel and Palmer held that in Title VII cases, a defendant generally cannot successfully prevent a plaintiff from carrying their ultimate burden of persuasion when its regression analysis has created an inference of discrimination by merely pointing out the omission of a potentially relevant variable. Again, what is necessary to carry a burden in a title VII case is a distinct issue from the one presented here.

25

Here, the question is whether Bays, a qualified expert, may opine that Didow did not consider factors which may have, not necessarily would have, impacted Didow's analysis. In light of Bays's qualifications, his opinion – grounded in reliable economic principles – that other variables may have affected Didow's analysis is admissible.

Plaintiffs also seek to exclude Bays's opinion that Didow's product life cycle for plaintiffs' and defendants' software is too long, arguing that it is a bald assertion based in nothing more than what Bays describes as "general knowledge" of the rapidly changing software industry. However, Bays's opinion is based in his knowledge of the economics of the field as well as his prior experience projecting losses for firms, including, notably, a software firm in a Lanham Act case (Terraserver.com, Inc. v. Microsoft Corp., 5:08-cv-250-H). Thus where his assertion is based in his expertise in economics, and his previous experience projecting losses in the field, his opinion as to product life cycle in this case is admissible.

Finally, plaintiffs object to Bays's opinion that Didow assumes plaintiffs are correct in their allegations regarding the falsity of the comparison charts. Review of Bays's report shows that he critiques Didow for opining that the comparison charts were false based on discovery documents and "pointless citations to advertising and marketing textbooks." Bays Report 5. Where Didow is precluded from testifying as to his opinion of the veracity of the charts, any opinion Bays has as to Didow's inadmissible opinion is irrelevant. Further, for purposes of calculating damages, Didow is entitled to assume the charts were false. See United States Gypsum Co. v. LaFarge N. Am., Inc., 670 F. Supp. 2d 737, 741 (N.D.Ill. 2009). Therefore to the extent Bays wishes to critique Didow's underlying assumption as to the veracity of the comparison charts, he is precluded from doing so.

26

E.    Motion to Exclude Opinions of Mr. Litton and Dr. Bays Not Disclosed In Their Reports

Plaintiffs move to exclude opinions of Litton and Bays which they assert were not disclosed in their reports. These opinions can be divided into three categories: (1) the opinions of Litton and Bays as to the unreliability of Putsis's survey based upon SkilCheck's administration thereof; (2) Bays's opinions on Didow's regression analysis not disclosed in his report; and (3) Bays's and Litton's discussions of their qualifications in affidavits filed with the court.

Where the court has excluded the report, testimony, and survey of Dr. Putsis, any issues with respect to the administration of his survey are now moot. Thus plaintiffs' motion to exclude opinions relating thereto is granted.

Plaintiffs also contend that Bays's opinions not disclosed in his report must be excluded. Namely, plaintiffs assert that the following opinions must be excluded: (1) Didow should have tested the effect of SiteLink Web Edition's new pricing model on plaintiffs' revenues; (2) Didow's profit margin for plaintiffs was too high; (3) Didow only subtracted one year's worth additional expenses from fives years' worth allegedly lost revenue when calculating plaintiffs' supposedly lost past profits; (4) Didow did not subtract all appropriate expenses from supposedly lost past revenue; and (5) Didow did not address the fact that EMove, as a startup company, may have a different revenue trend than larger firms.

Federal Rule of Civil Procedure 26(a)(2)(I) provides that an expert's report must contain "all opinions the witness will express." "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless." Fed. R. Civ. P. 37(c)(1). In the Fourth Circuit, a district court has "board discretion to

27

determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis . . . ." S. States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). In making this determination, district courts are to weigh the following factors

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Id.

In this case, the court concludes that plaintiffs cannot credibly claim to be very surprised by Bays's opinions where Mr. Litton, in his report, already expressed the opinions that Didow's calculated profit margin for plaintiffs was too high, and the expenses Didow believed plaintiffs would have were too low. Moreover, Bays had already expressed opinions as to several factors Didow failed to consider which might impact the parties' revenues. Thus all of the opinions had either been expressed by defendants or were of a similar sort as Bays had expressed before.

Similarly, plaintiffs had ample opportunity to cure the surprise, but failed to do so. Plaintiffs deposed Bays shortly before the close of expert discovery, where he stated all of his opinions with respect to Didow's regression analysis at issue in the instant motion. Plaintiffs failed to request leave of defendants or of the court to depose Bays again. Moreover, in their motion to exclude the testimony of Bays, one month later they could have mentioned late disclosure of some opinions as a ground for exclusion, but did not do so. Instead, nearly three months later, after the close of discovery, and after their original motion to exclude Bays had been fully briefed, plaintiffs filed this motion. Therefore this factor also cuts against plaintiffs.

28

Further, allowing this evidence would not disrupt trial where no trial date is set in this case, and a motion for parial summary judgment is currently pending. The evidence is also important where it could impact damages. See Salami v. N. Carolina Agr. & Technical State Univ., 394 F. Supp. 2d 696, 710 (M.D.N.C. 2005) aff'd, 191 F. App'x 193 (4th Cir. 2006) (expert's testimony was important because it could impact damages). And while defendants give no explanation of Bays's failure to include these opinions in his report, the great weight of the other four factors shows this nondisclosure is harmless. Thus plaintiffs' motion to exclude the testimony of Bays relating to Didow's damages analysis is denied.

Finally, as to Bays's and Litton's discussion of their qualifications in their affidavits, the court denies plaintiffs' motion to exclude these where they merely restate and expand upon their qualifications. These do not constitute new opinions are areas of expertise previously completely hidden from plaintiffs. See Gaynor v. OB/GYN Specialists, Ltd., 51 F.Supp.2d 718, 725 (W.D.Va. 1999) (court considered affidavit of party's expert detailing his qualifications where "[p]laintiff did not intentionally or in bad faith hold back information" about its experts qualfications); Raytheon Aircraft Co. v. United States, No. 05-2328-JWL, 2008 WL 627488, *3-4 (D.Kan. Mar. 4, 2008) (denying plaintiff's motion to strike affidavit of defendant's expert where the expert "expands upon [his] experience in the face of a challenge" by plaintiff).

## CONCLUSION

For the foregoing reasons, plaintiffs' motions seeking to exclude the report and testimony of Litton and Bays are GRANTED in part and DENIED in part, Litton and Bays may testify subject to the parameters set forth herein. Similarly, defendants' motion to exclude the report and testimony of Didow is GRANTED in part and DENIED in part, and Didow may testify subject to the

parameters set forth herein. Defendants' motion to exclude the report, survey, and testimony of Putsis is GRANTED. Finally, Plaintiffs' motion to exclude opinions of Litton and Bays not disclosed in their reports is GRANTED with respect to that part regarding opinions relating to administration of Dr. Putsis's survey and DENIED remaining in part.

SO ORDERED, this the 29TH day of March, 2013.

LOUISE W. FLANAGAN
United States District Judge