THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:08-CV-403-FL

| | | |
|---|---|---|
| SMD SOFTWARE, INC., a North Carolina corporation; and SITELINK SOFTWARE, LLC, a North Carolina limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | ORDER (SEALED)[1] |
| v. | ) ) | |
| EMOVE, INC., a Nevada corporation; U-HAUL INTERNATIONAL, INC., a Nevada corporation; WEB TEAM ASSOCIATES, a Nevada corporation; and A&M ASSOCIATES, an Arizona corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter comes before the court on motion of defendant EMove, Inc. ("EMove"), joined
in by defendants U-Haul International, Inc. ("U-Haul"), Web Team Associates ("Web Team"), and
A&M Associates ("A&M") (sometimes collectively the " non-EMove defendants"), for partial
summary judgment. (DE 188). Defendants U-Haul, Web Team, and A&M also seek to extend the
motion to reach all claims against the non-EMove defendants, urging full or complete summary
judgment in their favor. The issues raised particular to each defendant are ripe for adjudication. For
reasons set forth below, the court GRANTS in part and DENIES in part defendants' motions.

---

[1] Where the court makes limited reference to information now sealed, this order provisionally is sealed subject
to further showing by a party hereto as to why said seal should be maintained in whole or in part.

## STATEMENT OF THE CASE

On July 14, 2008, plaintiffs initiated this action in Wake County Superior Court. On August 20, 2008, the action was removed to this court by U-Haul, at that time the only defendant. Plaintiffs, who sell self-storage management software called "SiteLink," asserted state law claims for defamation, unfair or deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq., and tortious product disparagement arising out of allegedly defamatory misrepresentations about plaintiffs' software in the context of advertisements for a competing software program, "WebSelfStorage." Plaintiffs also sought an injunction ordering defendant to cease and desist from circulating its allegedly false advertising and from making allegedly false and disparaging statements about plaintiffs' products.

On October 7, 2008, plaintiffs filed an amended complaint. The amended complaint named EMove, Inc., a wholly-owned subsidiary of U-Haul which sells WebSelfStorage, as the sole defendant. Plaintiffs asserted a federal claim for false advertising, in violation of the Lanham (Trademark) Act, 15 U.S.C. § 1051, et seq., in addition to the state law causes of action contained in their initial complaint. Two days later, plaintiffs filed a voluntary dismissal without prejudice as to U-Haul.

Approximately a year later, on October 6, 2009, plaintiffs filed an opposed motion for leave to file a second amended complaint, which motion was allowed on May 25, 2010. In their second amended complaint, plaintiffs assert five claims, including false advertising under the Lanham Act, as well as state law claims for defamation, unfair or deceptive trade practices under the North Carolina Unfair and Deceptive Trade Practices Act, tortious product disparagement, and an injunction against defendants EMove, U-Haul, and two other U-Haul subsidiaries, Web Team and

2

A&M.[2] According to plaintiffs, U-Haul owns WebSelfStorage, Web Team designed the software and provides technical support to users, and A&M produced the advertising materials at issue. All three defendants are alleged to have collaborated with their sister company EMove in the alleged defamatory advertising.

The non-EMove defendants filed a motion for summary judgment on March 10, 2011, contending that EMove is solely responsible for the alleged misrepresentations at issue. Plaintiffs responded in opposition, arguing that the non-EMove defendants' motion failed on the merits but also arguing that the court should defer consideration or deny the motion without prejudice under Rule 56(d) as discovery was still ongoing. On May 3, 2011, plaintiffs filed a motion to compel (DE 122). At hearing on June 9, 2011, plaintiffs' counsel suggested it would be appropriate for the court to first take up the motion to compel. The court stated that it would first "address the merits of plaintiffs' motion [to compel] and, if that motion was meritorious, would deny without prejudice the [non-EMove defendants'] motion for summary judgment." (Order Memorializing June 9, 2011 Hearing [DE 142] at 5.) The court stated that it was "more efficient upon resolution of the discovery motion to allow defendants to re-file their motion, making in unified form their arguments . . . ." (Id.).

By order entered June 22, 2011, the court granted plaintiffs' motion to compel, and denied without prejudice the non-EMove defendants' motion for summary judgment. In accordance with subsequent amendments to the court's case management order, on April 18, 2012, defendants filed a second motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, renewing their argument that defendant EMove alone is responsible for the alleged misrepresentations, and further

---

[2] Defendants have since ceased circulation of the advertisements at issue.

3

moving for summary judgment on plaintiffs' claims for defamation and treble damages as to all defendants. Defendants also contend that any damages recovered by plaintiffs should be limited due to statutes of limitations and plaintiffs' purported failure to mitigate damages.

## STATEMENT OF THE FACTS

A.    SiteLink and WebSelfStorage

The undisputed facts of this case are as follows. "SiteLink" is plaintiffs' PC- and internet-based self-storage management software that allows owners and operators of self-storage facilities to manage reservations, tenant insurance, billings, etc. (Lampe Dep. 45, 69-70, 73-77, Aug. 24, 2010.) "WebSelfStorage" is a competing software program owned by U-Haul and developed by its subsidiary Web Team. (DE 34-1 ["Celaya Oct. 2009 Aff."] ¶ 11; EMove 30(b)(6) Dep. 78, 80, June 4, 2009) U-Haul's subsidiary EMove has been given the exclusive right to sell WebSelfStorage, with Web Team providing technical support for users of the software.[3] (Celaya Oct. 2009 Aff. ¶¶ 8, 11.)

In 2004, EMove created a chart comparing WebSelfStorage to SiteLink and other competitors, based on a PowerPoint presentation created by EMove's then president, Srini Vassan ("Vassan"). (Vassan Dep. 78-79.) The brochure was given out to individuals attending trade shows. (Vassan Dep. 79, 81-82.) Neither Vassan nor Elise Sauer ("Sauer"), another EMove employee, recall who provided the information about SiteLink for purposes of the chart, although they stated

---

[3] E-Move was conceived as a moving help program by a former U-Haul storage operations manager in or around 2001. (Vassan Dep. 32.) It was launched in Fall 2002 as a website allowing individuals to employ local laborers to help those individuals load their belongings into a truck or trailer and/or to unload those belongings at a storage facility. (Id. at 57.) In 2003, the EMove "program" or "brand" began offering bundled services, including a "storage affiliate program" for independent self-storage facilities. (Id. at 62-65.) Currently, the storage affiliate program offers features such as advertising on EMove's website, the use of U-Haul reservation agents, discounted storage supplies, access to the WebSelfStorage software and technical support, and tenant insurance from another U-Haul subsidiary. (Pls.' Resp. Opp. Summ. J. Ex. 12.)

4

that they did not compile the information themselves. (Id. at 84; Sauer Dep. 39.) Although Samuel Celaya ("Celaya"), EMove's current director, states that EMove employees researched and investigated SiteLink's features to ensure accuracy of the chart, these employees are not identified. (Celaya Oct. 2009 Aff. ¶¶ 5-6.)

In 2005, the chart was updated and redone as a brochure. (Vassan Dep. 100.) Comparisons were once again made to SiteLink, as well as additional competing service providers. (Id. at 101.) Once again, the identity of the individual supplying the comparison information about SiteLink is unknown. (Id. at 101; Fugate Dep. 78; Sauer Dep. 57.) The brochure was updated again in 2008, and this time an EMove program manager named Ozkan Kenes ("Kenes") performed research to ensure the accuracy of the information relating to SiteLink and other WebSelfStorage competitors. (Kenes Dep. 38, 41, 48.)

According to plaintiffs, these charts and brochures contain a number of misrepresentations about SiteLink. These misrepresentations include (1) "erroneously inflating the price of [SiteLink];" (2) "erroneously representing that technical support for [SiteLink] is not included in the price of the software;" (3) "erroneously representing that [SiteLink] does not support real-time confirmed reservations;" (4) "erroneously representing that [SiteLink] does not include integrated credit-card processing;" (5) "erroneously representing that [SiteLink] does not include upgrades in the purchase price;" (6) "erroneously representing that [SiteLink] does not include integrated tenant insurance;" (7) "erroneously representing that [SiteLink] does not include fully integrated online-payment processing;" and (8) "erroneously representing that [SiteLink] does not include fully integrated call-center service." (Second Am. Compl. ¶ 23.)

B.    The Non-EMove Defendants' Role in the Production and Distribution of the 2008 Brochure

In 2007, U-Haul Chief Executive Officer Joe Shoen directed EMove to update its marketing materials. (Tonan Dep. 47.) As noted above, that task was delegated by Celaya to Kenes with respect to updating the information on SiteLink in the 2005 brochure. (EMove 30(b)(6) Dep. 291, Aug. 13, 2009.) After receiving the information from Kenes, Celaya and Sauer met with representatives of Web Team. (Sauer Dep. 103.) At that meeting, the individuals discussed using the aforementioned term "fully integrated" in the 2008 brochure as a "buzzword" to describe the functionality offered by WebSelfStorage as opposed to SiteLink and other competing software products. (Bierman Dep. 176-177, Aug. 11, 2009).

EMove took the contents of the 2008 brochure to A&M, which then performed design, layout, and printing work on it. (EMove 30(b)(6) Dep. 95-96, June 4, 2009; Celaya Oct. 2009 Aff. ¶ 9.) The completed brochure was shown to John Taylor ("Taylor"), who is both president of U-Haul and a director of EMove. (EMove 30(b)(6) Dep. 300-301, Aug. 13, 2009.) It was then distributed at trade shows and throughout the country via U-Haul's network of state-based marketing companies through "U-Haul's field representatives." (Huberty 31-32; Sauer Dep. 93-94.) The 2005 brochure was also distributed by U-Haul's marketing companies, although the 2004 chart appears only to have been distributed at trade shows. (EMove 30 (b)(6) Dep. 192, Aug. 13, 2009.)

C.     Relationship Between U-Haul and Its Subsidiaries

Many of plaintiffs' arguments are premised on the integration between various U-Haul entities. Plaintiffs note that, in addition to allowing EMove to sell its WebSelfStorage software, U-Haul also has an agreement with EMove promising to provide advertising, accounting services, technology support, personnel, and payroll services to EMove in exchange for $25.00 per year. (Master Services Agreement, Pls.' Resp. Opp. Summ. J. Ex. 14; U-Haul 30(b)(6) Dep. 50.) They

6

also note that EMove, Web Team, and A&M are all located in the same building as U-Haul. (EMove 30(b)(6) Dep. 84, 95-96, June 4, 2009.) These defendants share a number of common officers and directors, including Taylor, president of U-Haul and a director of the other defendants; Jennifer Settles, secretary of all defendants; George Olds, an officer of each of the non-EMove defendants; Samuel Shoen, the president and treasurer of EMove and Web Team and a director of all defendants; and Edward Shoen, a director of U-Haul, EMove, and Web Team. (Pls.' Resp. Opp. Summ. J. Ex. 23.) EMove currently has only seven employees. (Sauer Dep. 25.)

Plaintiffs also point to the integrated marketing among the various entities within "the U-Haul umbrella." Numerous wholly-owned subsidiary marketing companies are able to order advertising and promotional materials, including the WebSelfStorage brochures at issue here, from U-Haul's "Web Best" internet site. (Huberty Dep. 31; EMove 30(b)(6) Dep. 263-264, Aug. 13, 2009.) These companies work in conjunction with EMove to sell WebSelfStorage, because they are "all under the U-Haul name, . . . and basically part of their job is to sell the EMove program." (Huberty Dep. 32, 34-35, 64.) The marketing companies report to a U-Haul area district vice-president, who reports to an executive vice-president, who reports to U-Haul's CEO. (EMove 30(b)(6) Dep. 22, June 3, 2009.)

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is

7

sufficient evidence for a reasonable jury to find for the non-moving party). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).[4] The question is whether viewing the evidence and drawing all reasonable inferences from that evidence in a light most favorable to the nonmoving party, a reasonable trier of fact could find in favor of the nonmoving party. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 164-65 (4th Cir. 2012).

B.     Analysis

1.     Defendants' Motion for Partial Summary Judgment as to All Defendants

As an initial matter, there appears to be no dispute between the parties that North Carolina law governs plaintiffs' claims for defamation and tortious product disparagement, together with its claim for unfair and deceptive trade practices. Although the North Carolina Supreme Court has not addressed the question of "what law applies in multi-state misrepresentation or unfair trade practice cases," Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 272 (4th Cir. 1982), and the court has identified two different tests used by both the North Carolina Court of Appeals and federal courts, either test would direct the application of North Carolina law in this case. See American Rockwool, Inc. v. Owens-Corning Fiberglas Corp., 640 F. Supp. 1411, 1432 (E.D.N.C. 1986); Synovous Bank

---

[4] In asserting that a fact cannot genuinely be disputed, a party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court is required only to consider those materials specifically cited, although it may consider other materials in the record in its discretion. Fed. R. Civ. P. 56(c)(3).

v. Coleman, 887 F. Supp. 2d. 659, 669 (W.D.N.C. 2012).

The parties further agree that under North Carolina law plaintiffs' defamation claim fails as a matter of law where the comparison charts at issue do not impeach plaintiffs in their trade or profession, but only make claims regarding plaintiffs' products. See Eli Research, Inc. v. United Commc'ns Grp., LLC, 312 F. Supp. 2d 748, 762 (M.D.N.C. 2004). Therefore plaintiffs' claim for defamation is dismissed.

      a.    Treble Damages under the North Carolina Unfair and Deceptive Trade Practices Act

Defendants contend that plaintiffs' claim for treble damages under N.C. Gen. Stat. § 75-16 is unconstitutional where the vast majority of defendants' alleged wrongdoing occurred outside of North Carolina. Under section 75-16, part of the North Carolina Unfair and Deceptive Trade Practices Act, a plaintiff injured by a violation of that act is entitled to treble damages. However, "[t]here must be at least some minimal contact between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction." Adventure Communications, Inc. v. Kentucky Registry of Election Fin., 191 F.3d 429, 436 (4th Cir. 1999) (quoting Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 314 n. 2, (1970)). Moreover, a defendant must reasonably have notice of the statute. American Rockwool, Inc., 640 F. Supp. at 1436 (E.D.N.C. 1986).

Additionally, the Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. CONST. art. 1, § 8, cl. 3. Courts have also long recognized that the Commerce Clause not only empowers Congress to regulate interstate commerce, but also "limits the power of the States to erect barriers against interstate trade."

9

Dennis v. Higgins, 498 U.S. 439, 446 (1991). If a state law places a burden on interstate commerce that is clearly excessive in relation to the putative local benefits it is invalid. Pike v. Bruce Church, 397 U.S. 137, 142 (1970); Brown v. Hovatter, 561 F.3d 357, 363 (4th Cir. 2009).

Defendants argue that plaintiffs' treble damages under section 75-16 is unconstitutional, citing the court's decision in American Rockwool. In that case, defendant, a Delaware corporation with its principal place of business in Ohio, was alleged to have engaged in a multi-state product disparagement campaign against a North Carolina-based plaintiff. Id. at 1423-25. The court held that application of section 75-16 would violate due process where defendant had "no reason to expect that it was subject to the treble damage penalty or sanction of North Carolina law for statements . . . made outside the borders of North Carolina by an Ohio company." Id. at 1436. The court also found that application of the section 75-16 damages multiplier would significantly burden interstate commerce where it would require "a company engaged in interstate commerce to determine the magnitude of its potential liability for multi-state conduct." Id. at 1437.

The situation in American Rockwool is on all fours with that in this case. Just as in American Rockwool, plaintiffs are alleging that defendants engaged in a multi-state disparagement campaign of their products, indeed, they allege defendants' conduct was nationwide.[5] For the same reasons, as in American Rockwool "it is not reasonable–in a due process sense" to charge defendants with knowledge of section 75-16. Id. at 1436 (quotations omitted). Similarly, application of section 75-16 to extra-territorial conduct in this case would also unjustifiably burden interstate commerce.

---

[5] Plaintiffs do not dispute the reasoning of American Rockwool, but argue it is distinguishable from this case. Plaintiffs assert that the disparagement at issue in American Rockwool was wholly extra-territorial, unlike in this case where plaintiffs allege engaged in unfair trade practices in North Carolina as well as other states. This argument is without merit for the simple fact that it is untrue. The defendant's alleged disparagement in American Rockwool was not wholly extra-territorial but "was carried out in substantial part in North Carolina." Id. at 1427.

10

See id. at 1437. Thus, where plaintiffs have not determined the extent their alleged damages were caused by defendants' alleged in-state conduct as opposed to their defendant's extra-territorial conduct, their claim for treble damages under section 75-16 is unconstitutional, and must be dismissed.

        b.      Failure to Mitigate

Defendants next argue that plaintiffs should be barred from recovering any purported damages accruing to plaintiffs after a 2007 Las Vegas trade show, or, in the alternative, any damages related to the 2008 comparison chart where defendants argue plaintiffs failed to mitigate any alleged damages. Plaintiffs' Chief Operating Officer, Markus Hecker, confronted some of defendants' representatives at a 2007 Las Vegas trade show, and demanded they "stop making false statements" about plaintiffs' products. In response, representatives asked Mr. Hecker what truthful statements would be, and he refused to provide them with this information. Similar confrontations occurred at two other trade shows before the publication of the 2008 comparison chart.

An injured plaintiff has a duty to exercise reasonable care to minimize the consequences of a defendant's wrong. Miller v. Miller, 273 N.C. 228, 239, 160 S.E.2d 65, 73-74 (1968); see also Troitino v. Goodman, 225 N.C. 406, 416, 35 S.E.2d 277, 284 (1945)(a party injured by "the wrongful or negligent act of another is required to protect himself from loss, if he can do so with reasonable exertion or at trifling expense"). A plaintiff may not recover for damages resulting from their failure to so mitigate. Miller, 273 N.C. at 239. However, this principle "has no application where the wrongdoer has the opportunity to remedy the wrong and avoid damage." Shaw v. City of Greensboro, 178 N.C. 426, 101 S.E. 27, 29 (1919).

11

In this case, use of the allegedly deceptive and misleading comparison charts was ongoing. Therefore, defendants had a clear ability to remedy the alleged wrong and avoid any damages by ceasing to use the charts or by correcting any deceptive or misleading information that may have been contained therein. While asking plaintiffs what truthful information would be is one way of attempting to correct any potentially erroneous information, it certainly is not the only way. Because there was opportunity to remedy any alleged wrong and avoid any further damages, plaintiffs had no duty to mitigate.[6]

          c.      Statute of Limitations

Defendants argue that plaintiffs' claim for tortious product disparagement is subject to a three-year statute of limitations.[7] Where plaintiffs' filed their first complaint on July 14, 2008, defendants argue that any potential recovery by plaintiffs in this claim should be limited to damages as a result of publications made after July 14, 2005. Plaintiffs contend that Rule 56 is an improper vehicle for limiting damages because the rule requires entry of "judgment" on the claim and a limitation of damages is not a "judgment."

"A party may move for summary judgment, identifying each claim or defense--*or the part of each claim or defense*--on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis

---

[6] Furthermore, even if plaintiffs had a duty to mitigate, that duty would demand plaintiffs undertake reasonable efforts to minimize their harm. Miller, 273 N.C. at 239. Questions of what is reasonable are generally for a jury to determine. See Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP., 350 N.C. 214, 224-25, 513 S.E.2d 320, 327-28 (1999) ("What is reasonable is . . . dependent upon the circumstances. . . . The question is one for the jury, unless the facts are so clear as to permit only one conclusion.") see also Team Gordon, Inc. v. Fruit of the Loom, Inc., 3:06-CV-201-RJC, 2009 WL 426555 (W.D.N.C. Feb. 19, 2009) (reasonableness of mitigation efforts depends on the circumstances of the particular case and is a jury question in all but the clearest of cases) (quotations omitted). Whether it would be reasonable in this case for plaintiffs to reveal business information to a competitor in order to correct a purportedly false is properly a question for the jury.

[7] Defendants also argued that damages for defamation should be limited by a one-year statute of limitations. Where the court has dismissed this claim, however, that argument is moot.

added). As the advisory committee notes explain, this sentence was added as part of the 2010 amendments to Rule 56 " to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, *or part of a claim or defense*." (Emphasis added). Here, defendants request summary judgment on part of one of plaintiffs' claims, as allowed by Rule 56(a). Where plaintiffs raise no factual dispute bearing on the applicability of the statute of limitations, the question presented to the court is a quintessential legal question and appropriate for disposition on summary judgment.[8]

The court notes that applicability of the statute of limitations is an affirmative defense which defendants did not plead in their answer. However, "it is well established that an affirmative defense is not waived absent unfair surprise or prejudice." Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 205 (4th Cir. 2004). Indeed "[n]eglect to affirmatively plead the defense is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise." Grunley Walsh U.S., LLC v. Raap, 386 F. App'x 455, 460 (4th Cir. 2010) (quoting Jones v. Miles, 656 F.2d 103, 108 (5th Cir.1981)). In this case, plaintiffs have made no showing of prejudice nor claimed any surprise, therefore this defense may properly be considered by the court.

The next question is what statute of limitations applies to a claim for tortious product disparagement. No North Carolina court appears to have addressed this question. Indeed, no North Carolina court appears to have specifically defined the elements for this tort. Thus in Livingston Chemicals, Inc. v. Permviro Sys., Inc., 981 F.2d 1251, 1992 WL 374024 at *3 (4th Cir. Dec. 21,

---

[8] Indeed, limitation of damages routinely occurs on summary judgment. See e.g., Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 285 (4th Cir. 2003) abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010); Archer Daniels Midland Co. v. Brunswick Cnty., N.C., 129 F. App'x 16, 17 (4th Cir. 2005); Managed Care Professionals, Inc. v. Medlantic Healthcare Grp., 164 F.3d 624, 1998 WL 704458, at *5-7 (4th Cir. Oct. 1, 1998) (unpublished table decision).

1992) (unpublished table decision), when examining a claim for tortious product disparagement, the Fourth Circuit used the elements laid down by North Carolina courts for "the analagous cause of action for a slander of title." See also Rawn Howard Reinhard, The Tort of Disparagement and the Developing First Amendment, 1987 Duke L.J. 727, 728-29 (1987) (discussing two kinds of disparagement, "slander of title," and "trade libel" or "product disparagement"). Therefore, the court finds it appropriate to apply the statute of limitations for slander of title, which in North Carolina, is three years. As noted by defendants, plaintiffs filed their initial complaint in this matter on July 14, 2008, thus any potential recovery by plaintiffs for tortious product disparagement is limited to damages accruing to plaintiffs as a result of publications made after July 14, 2005.

2.      Defendants' Motion for Summary Judgment as to the non-EMove Defendants

Defendants argue that full summary judgment is appropriate as to the non-EMove defendants, contending that plaintiffs have not forecast sufficient evidence to show that the non-EMove defendants were joint tortfeasors in any of the torts plaintiffs allege were committed, and that plaintiffs are not entitled to pierce the corporate veil between EMove and the non-EMove defendants.

a.      Piercing the Corporate Veil

Defendants argue that the corporate veil between EMove and non-EMove defendants should not be pierced on both procedural and substantive grounds. As to the procedural grounds, the non-EMove defendants assert that plaintiffs may not assert this theory of liability where they have not pleaded it in their complaint. Plaintiffs argue that their failure to plead this theory is no barrier because their complaint should be deemed amended pursuant to Rule 15(b).

14

Rule 15(b) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 5(b)(2). "Because notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies only when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them." Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 901 (4th Cir.1996).

Courts of appeal are split as to whether or not Rule 15(b) applies at the summary judgment stage. See Ahmad v. Furlong, 435 F.3d 1196, 1203 n. 1 (10th Cir. 2006) (collecting cases). This circuit has applied Rule 15(b) at the summary judgment stage, deeming complaints amended. See People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367-68 (4th Cir. 2001) (finding defendant liable under the Anticybersquatting Consumer Protection Act despite the fact that plaintiff had not raised this claim prior to summary judgment); Bollino v. Baltimore & Ohio R. Co., 856 F.2d 186, 1988 WL 86619, at *2 n.1 (4th Cir. Aug. 17, 1988) (unpublished table decision) (deeming pleadings amended to included plaintiff's theory of *respondeat superior* liability first raised in its motion for summary judgment).

Here also, plaintiffs' failure to plead veil piercing is no bar to their raising this theory in response to defendants' motion for summary judgment. Defendants clearly had notice of this issue where plaintiffs served EMove with a request for production of documents relating to piercing the corporate veil of EMove in June of 2009, and raised this theory of liability in response to defendants' first motion for summary judgment, which response was filed one year prior to the instant motion for summary judgment. See Pls.' Resp. Opp'n First Mot. Summ. J. 23-27 (DE 115).

15

Feldman v. Pro Football, Inc., 419 F. App'x 381 (4th Cir. 2011), further demonstrates the propriety of deeming plaintiffs' complaint amended under Rule 15(b). In Feldman, the Fourth Circuit affirmed the district court's refusal to amend under Rule 15(b) plaintiffs' complaint to include a claim raised for the first time at summary judgment. Id. at 389-90. The court held that because defendants had "merely objected to plaintiffs'" raising a new claim and had not "vigorously defend[ed] against" that claim at summary judgment, defendants had not "essentially tr[ied] or litigate[d] the issue." Id. Thus the court held there was no "express or implied consent," to try the claim as required by Rule 15(b)(2). Id. By contrast, defendants in this case have vigorously defended against plaintiffs' veil peircing claim on the merits, and thus have given implied consent to litigation of the issue. As noted above, defendants also have had abundant notice of this claim. Therefore plaintiffs' failure to plead veil piercing is no bar to their raising the matter at this time.

Plaintiffs' veil-piercing claim, however, fails on the merits. North Carolina choice of law governs in this case. See In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988) (in a diversity action a federal court applies the choice of law rules of the state in which it sits). Federal courts have concluded that the North Carolina Supreme Court would likely apply the law of the state of incorporation of the entity whose veil a plaintiff is seeking to pierce should a choice of law question arise. See e.g., Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 249 (M.D.N.C. 1995); Jo v. Piston Mfg., Inc., No. 4:06-CV-00076, 2009 WL 1578522 (E.D.N.C. June 2, 2009). EMove is incorporated in Nevada, therefore Nevada laws relating to piercing the corporate veil govern.[9]

---

[9] Both parties suggest that Nevada law is substantively identical to North Carolina law, and so proceed to use North Carolina law in making their arguments. Any similarities in the law notwithstanding, choice of law rules dictate the application of Nevada law. North Carolina decisions regarding North Carolina law -- even where that law is similar

16

Under Nevada law "no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation." Nev. Rev. Stat. § 78.747.

> A stockholder, director or officer acts as the alter ego of a corporation if: (a) The corporation is influenced and governed by the stockholder, director or officer; (b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and (c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

Id.; see also Truck Ins. Exch. v. Palmer J. Swanson, Inc., 124 Nev. 629, 635, 189 P.3d 656, 660 (2008); LFC Mktg. Grp., Inc. v. Loomis, 116 Nev. 896, 904, 8 P.3d 841, 847 (2000). In considering these factors, a court should keep in mind that "'[t]he corporate cloak is not lightly thrown aside' and that the alter ego doctrine is an exception to the general rule recognizing corporate independence." LFC Mktg. Grp., Inc., 116 Nev. at 903-04 (quoting Baer v. Amos J. Walker, Inc., 85 Nev. 219, 220, 452 P.2d 916, 916 (1969)).

Here, there is no genuine issue of material fact regarding the third requirement for veil-piercing: that adherence to the fiction of a separate entity would in this circumstance, sanction a fraud or promote injustice. As previously noted, a factual dispute is genuine only if there is sufficient evidence for a reasonable jury to find for the non-moving party. Anderson, 477 U.S. 247-48. Plaintiffs have neither contended, nor pointed to any evidence of record, "that the financial setup of the corporation is only a sham and caused an injustice." N. Arlington Med. Bldg., Inc. v. Sanchez Const. Co., 86 Nev. 515, 522, 471 P.2d 240, 244 (1970). To survive summary judgment, it is not enough for plaintiffs to point to factors raising issues of material fact as to whether defendant EMove

---

to the law of Nevada -- do not purport to be decisions regarding Nevada law. Thus the court looks to the law of Nevada in its determination of this issue.

17

was controlled by and inseparable from defendant U-Haul, there must also be genuine issues as to how adherence to the corporate form would "sanction[] a fraud or promote[] an injustice towards" plaintiffs. Id. at 245. On the record before the court, there is no such evidence. Plaintiffs merely have asserted that because defendant [U-Haul] is "responsible in reality" it should be held liable. Thus, plaintiffs' claim for piercing the corporate veil fails as a matter of law.

        b.     Joint Tortfeasor and Agency Liability

Defendants argue that if the court does not set aside the corporate form, plaintiffs have not forecast sufficient evidence to support any of their claims against the non-EMove defendants on any of their remaining claims. Contributory false advertising under the Lanham Act is actionable. Coach, Inc. v. Farmers Mkt. & Auction, 881 F. Supp. 2d 695, 704 (D. Md. 2012). Federal courts have found that such joint tortfeasor liability is available only where a defendant has "at least constructive knowledge of the . . . false advertising." Id. at 705; see also Trafficschool.com, Inc. v. Edriver, Inc., 633 F. Supp. 2d. 1063, 1082 (C.D. Cal. 2008); Gilette Co. v. Wilkinson Sword, Inc. 795 F. Supp. 662, 664 (S.D.N.Y. 1992) (contributory liability under the Lanham Act applies where a defendant "participated in the creation, development, and propagation of a false advertising campaign with knowledge of its falsity").

Plaintiffs argue that the non-EMove defendants need not have knowledge of the falsity of the advertisements to be liable under the Lanham Act. This standard is erroneous. While an advertiser need not have such knowledge, see American Rockwool, Inc., 640 F. Supp. At 1449 ("[T]here is no requirement under the Lanham Act of proof of specific knowledge of the falsity of the representation made."), cases such as Coach make clear that at least constructive knowledge of falsity is required in order to hold non-advertisers contributorily liable.

18

Similarly, to prevail on a claim for tortious product disparagement[10] a plaintiff must show that the words were maliciously uttered. Town of Nags Head v. Toloczko, 863 F.Supp.2d 516, 535 (E.D.N.C. 2012) (citing Mecimore v. Cothren, 109 N.C.App. 650, 654, 428 S.E.2d 470 (1993)). A statement is malicious if the statement regarding the product was not made in "good faith," or was made without "probable cause for the defendant's belief," or the defendant "could not honestly have entertained such belief." Cardon v. McConnell, 120 N.C. 461, 461, 27 S.E. 109 (1897).

Finally, to recover under the North Carolina Unfair and Deceptive Trade Practices Act ("section 75-1.1"), a plaintiff must show that "(1) the defendant engaged in conduct that was in or affecting commerce, (2) the conduct was unfair or had the capacity or tendency to deceive, and (3) the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012), as amended (May 9, 2012).

> Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace. A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. . . . [A] practice is deceptive if it has the capacity or tendency to deceive.

Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

The court now particularly examines whether plaintiffs have forecast sufficient evidence as to each of its claims with respect to each of the non-EMove defendants.

---

[10] As previously discussed, see *supra* Part B.1.c. where the elements of this tort have not been defined by the North Carolina courts, this court looks to the elements for the similar tort of slander of title. See Livingston Chemicals, Inc., 1992 WL 1992 WL 374024 at *3 (looking to the elements for slander of title when considering issues of product disparagement).

19

I.      U-Haul

The court finds that plaintiffs have not shown that there is a genuine issue of material fact with respect to the liability of U-Haul on plaintiffs' remaining claims. With respect to the Lanham Act claim, plaintiffs have not brought forth evidence showing that U-Haul had knowledge of any falsity of the statements in the brochures. In fact, the evidence of record shows that U-Haul was not responsible for the creation and substantive accuracy of the brochures. See U-Haul 30(b)(6) Dep. 86-89, 102, 137. Plaintiffs have brought forward no evidence to refute this, or to show that U-Haul had knowledge of the falsity of the brochures.

Plaintiffs argue that because U-Haul – not EMove – actually owns WebSelfStorage, see U-Haul 30(b)(6) Dep. 50-51, 54, U-Haul cannot escape liability for any falsity of advertisements about its product. The fact that U-Haul owns WebSelfStorage, however, does not make U-Haul the advertiser. EMove possesses the exclusive right to market and sell WebSelfStorage and the advertisement was EMove's advertisement. Celaya Oct. 2009 Aff. ¶¶ 8, 11. U-Haul's ownership of WebSelfStorage does not change the applicable legal standard.

Plaintiff also argues that U-Haul is liable where it distributed the brochures through agent subsidiaries known as "marketing companies." See Huberty Dep. 31-32; EMove 30(b)(6) Dep. 263 Aug. 13, 2009. Assuming, without deciding, that these subsidiaries were acting as agents of U-Haul such that their actions could be imputed to U-Haul, distribution does not show that U-Haul had knowledge of the purported falsity in the advertisements.

For the same reasons, plaintiffs' claim for tortious product disparagement against U-Haul fails as a matter of law. On the record before the court, no reasonable jury could find that U-Haul acted with the requisite malice needed to be liable for this tort. Plaintiffs have brought forth no

20

evidence indicating there is a genuine issue of material fact as to whether U-Haul had reason to believe the comparison charts contained any false statements.

Finally, an examination of the evidence shows plaintiffs have not forecast sufficient evidence to support a claim under section 75-1.1 against U-Haul where nothing indicates actions taken by U-Haul were unfair or deceptive. Specifically, plaintiffs point to no evidence that U-Haul caused EMove to create the allegedly false brochures. All plaintiffs have shown is that EMove has the exclusive right to market U-Haul's WebSelfStorage product, see Celaya Oct. 2009 Aff. ¶ 8, in 2008 U-Haul asked each subsidiary to update their marketing materials, see Tonan Dep. 47, and that U-Haul distributed EMove's advertising materials through the marketing companies. Simply asking a subsidiary to refresh their advertising, or providing services to distribute that advertising, however, is neither an unfair nor deceptive practice. See S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002) (an unfair practice under section 75-1.1 is conduct which a court of equity would consider unfair).[11]

### ii. A&M

Similarly, plaintiffs have failed to show a genuine issue of material fact as to the liability of A&M. Plaintiffs' only evidence regarding A&M's involvement is that U-Haul tasked A&M with producing the brochures. See EMove 30(b)(6) Dep. 95-96, June 4, 2009. However, mere production of another's advertisement is insufficient to create liability under the Lanham Act barring knowledge

---

[11] This conclusion is buttressed by the Restatement (Third) of Unfair Competition § 7 (1995), which provides as follows: "(1) One who, by supplying materials or rendering services to a third person, directly and substantially assists the third person in making a representation that subjects the third person to liability to another for deceptive marketing under the rules stated in §§ 2-6 is subject to liability to that other for contributory deceptive marketing. (2) If an actor subject to contributory liability under the rule stated in Subsection (1) acted without knowledge that the actor was assisting the third person in making a representation likely to deceive or mislead, the actor is subject only to appropriate injunctive relief." While this restatement is not North Carolina law, where there is a dearth of North Carolina caselaw on the subject of contributory liability under section 75-1.1, the court finds the restatement informative and pursuasive.

of the falsity of the advertisement. See Coach, Inc., 881 F. Supp. 2d at 705. Again, plaintiffs have produced no evidence that A&M had such knowledge. Thus no reasonable juror could find A&M liable for violations of the Lanham Act on this record.

Again, for the same reasons, plaintiffs' state law claims fail. The evidence shows only that A&M produced the brochures at issue. Plaintiffs have failed to forecast any evidence of the malice required for a claim of tortious product disparagment on the part of A&M. Nor is A&M's mere production of another's advertisement an unfair or deceptive act in the absence of any knowledge that the advertisement is false. Therefore A&M is entitled to summary judgment on plaintiffs' remaining state law claims.

### iii. Web Team

Plaintiffs have, however, raised a genuine issue of material fact with respect to Web Team's liability on plaintiffs' claims. There is evidence showing that representatives of Web Team met with representatives from EMove to determine if the information on the 2008 brochure was accurate. See Bierman Dep. 58-60, Aug. 11, 2009. Although EMove was "primarily responsible" for making sure the content was presented properly, representatives from Web Team had "understanding . . . of the competition" and their competitors' products (including SiteLink). Id. Together representatives from Web Team and EMove discussed the information that should be in the 2008 brochure, such as the term "fully integrated." See id. at 67, 176-77. Thus plaintiffs have raised a question of material fact, namely, whether defendant Web Team participated in the creation development of the advertisements with "at least constructive knowledge of the . . . false advertising." Coach, Inc., 881 F. Supp. 2d at 705.

For the same reasons, plaintiffs have shown the existence of a genuine issue of material fact

with respect to their remaining state law claims. There is a question of material fact as to whether or not Web Team was a joint tortfeasor in maliciously making a false statement which caused pecuniary damage to plaintiff, thus Web Team is not entitled to summary judgment on plaintiffs' claim for tortious product disparagement. Similarly, under section 75-1.1, Web Team's work in creating the 2008 brochure creates a genuine issue of material fact as to whether or not it engaged in activity that was "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" or one that had "the capacity or tendency to deceive." Marshall, 302 N.C. at 548. Thus defendants' motion for full summary judgment for Web Team is denied.

## CONCLUSION

For the reasons set forth above, the court GRANTS in part and DENIES in part defendants' motion for partial summary judgment. With respect to the motion for partial summary judgment as to all defendants, the court GRANTS summary judgment on plaintiffs' claims for defamation, and treble damages under the North Carolina Unfair and Deceptive Trade Practices Act. The court also GRANTS defendants' motion for summary judgment that plaintiffs' claim for tortious product disparagement be limited under the three-year statute of limitations to damages as a result of publications made after July 14, 2005. However, defendants' motion to limit damages due to failure to mitigate is DENIED. With respect to the motion for summary judgment as to the non-EMove defendants, the court GRANTS the motion as to defendants U-Haul and A&M, but DENIES the motion as to defendant Web Team, as set forth above.

The case remaining against defendants EMove and Web Team proceeds now towards trial. The parties shall tender to the court a supplemental joint report informing as to anticipated length of trial, and alternative proposed trial dates. If the parties would seek opportunity to engage in

23

further mediation, in advance of their final pretrial activities, said report, due May 17, 2013, shall inform on this.

As noted, where the court makes limited reference to information now sealed, this order provisionally is sealed subject to further showing by a party hereto as to why said seal should be maintained in whole or in part. The parties' position(s) on this shall be set forth in the joint report ordered to be filed on or before May 17, 2013. Absent a showing that a party's interests outweigh in this instance public access to this order, the court will unseal its order. If any party would seek conference by telephone with the court, before entry of an order on trial scheduling, request for conference also shall be memorialized in the report to be filed.

SO ORDERED, this the 30th day of April, 2013.

LOUISE W. FLANAGAN
United States District Judge

24